STATE of Indiana, Plaintiff-Appellant,

v.

George DUTTON, Defendant-Appellee.

No. 2–280A65.

Court of Appeals of Indiana,
Fourth District.

June 10, 1980.

Theodore L. Sendak, Atty. Gen., Michael Gene Worden, Asst. Atty. Gen., Indianapolis, for plaintiff-appellant.

E. Kent Moore, Moore, Sandy, Moore & Deets, Lafayette, for defendant-appellee.

MILLER, Presiding Judge.

The defendant George Dutton was acquitted by a jury of the charge of attempted rape. (Ind. Code 35–41–5–1, Ind. Code 35–42–4–1) The State, being aggrieved of this result, appeals upon several reserved questions of law.

The State's case was based almost wholly on the allegations of Ronda Holladay who lived with her husband (they were married shortly after this incident) in the basement apartment of the same building where Dutton lived with his wife. Ronda, age 20, on the night in question was in her apartment alone at approximately 8:00 P.M. while Mr. Holladay was at work. She alleged that Dutton, who she had seen and talked to rarely since moving to the apartment, came to her door and, when she opened it and walked away, entered the apartment, tried to kiss her and make other sexual advances. He then allegedly picked her up, took her in the bedroom, jerked her shorts and underwear off and said he wasn't going to let her up until she submitted to sexual intercourse. She said she struggled and screamed but after a short time he became angry, said "you win", and left, leaving his jacket on the floor. She took the jacket and threw it out of the apartment. She put on her clothes and went to a nearby gasoline service station where she called Mr. Holladay. The service station attendant testified the call concerned the fact that she had been sexually attacked. Shortly after Mr. Holladay's return to the apartment he had a confrontation with Dutton and struck and beat him.

Dutton testified that earlier in the evening he noticed Ronda's door was open and closed it. He denied seeing or sexually assaulting her. He stated that after he was attacked by Mr. Holladay, he picked up his wife at work, returned home and explained to her that he had no knowledge of why he was attacked. The alleged crime occurred on May 2, 1979. Between that time and the time of his arrest, Dutton was not contacted by authorities. On May 17, which was a Thursday, the criminal information was filed and a warrant issued for Dutton's arrest. This warrant was not served on Dutton that Thursday or the following Friday, but rather, on Saturday morning at 3:00 A.M. when he was arrested at his apartment and taken to jail under $25,000 bond. After finally appearing before a magistrate the following Monday, his bond was reduced to $10,000 and he was released.[1] Mr. Dutton was born and raised in the Lafayette, Indiana area and had three brothers and one sister living in the same community. He was 37 at the time of trial and regularly employed.

The defense was able to point to several discrepancies in the State's evidence and criticized what it termed a lack of investigation on the part of the police and prosecutor. Dutton was acquitted.

I.

■ The State's first alleged error concerns the denial of its motion in limine in which it requested that all parties, attorneys and/or witnesses refrain from mentioning in the presence of the jury "any matters concerning the victim Ronda Faye Smith Holladay's fitness as a parent, including court proceedings related thereto, or any abuse by any person of the child of the victim by her former husband."

The State refers us to the following examination of Ronda after it had already been established, without objection, that she was once married to one Leon Raymond Smith in 1975:

"Q. And when did the two of you divorce?

---

1. Neither the delay in serving the arrest warrant nor the unusual time of arrest (3:00 A.M.) on a weekend when a magistrate was not ap-

parently available to reduce bail is explained in the record. We trust such a procedure was not followed by design.

MR. DIAMOND: Your Honor, I question the relevancy of this whole line of questioning. It has nothing whatever to do with this case.

MR. MOORE: I think we ought to go a little bit into her background just to—

THE COURT: It's overruled.

Q. When did you get divorced?

A. August the 24th, 1979.

Q. '79 or '78?

A. It was '78.

Q. Any children born to that marriage?

A. Yes.

Q. Okay. And how many?

A. One.

Q. And what is the name of that child?

MR. DIAMOND: Your Honor, again I'm going to renew the objection. This has nothing whatever to do with this case. It is no—it has no relevancy. It is not in any way related to the matter of the direct examination so it'd be beyond the scope. It's certainly not impeachment or leading to any proper impeachment. So it simply has nothing whatever to do with the case.

THE COURT: It's sustained.

MR. MOORE: Do I have to call her as my witness to—

THE COURT: I guess you'll have to.

Q. Do you have custody of that child at this time?

A. No.

MR. DIAMOND: Objection, Your Honor, for the same grounds.

MR. MOORE: Your Honor, I think that you know, when they put her on the stand, we can go into her background a little bit, and—and this is going to—to her character and the type of person that she is."

The State argues in its brief:

"Although the Defendant was not able to specifically inquire into any misconduct with respect to Ronda Holladay's child, the State's case was prejudiced by the fact Defendant had inquired into her prior marriage, that she had a child by the prior marriage, and by the fact that Defendant questioned her as to custody of that child. Defendant's questioning placed impermissible suspicious [sic] on the character of the victim of the crime for which Defendant was charged—precisely the result the State's motion in limine was intended to prevent."

We have difficulty in finding the above to be cogent argument as to exactly how the questioning "placed impermissible, suspicious [sic] on the character of the victim." We are forced to speculate as to how this might conceivably be prejudicial to the State. Is the State suggesting the jury could have inferred that after a contested divorce proceeding Ronda was held to be unfit to have "legal" custody of the child or perhaps that there could have been an inference that Ronda had been found guilty of child abuse and deprived of such custody. The subject matter of the questioning was arguably irrelevant but the judge reacted properly before the State was prejudiced.

II.

The State also complains the judge erred in granting Dutton's oral motion in limine which had the effect of excluding both testimony of the attendant at the gas station where, about fifteen minutes after the incident, Ronda telephoned Mr. Holladay, and certain testimony of Mr. Holladay. The State was trying to establish details of her initial complaint, including the fact that Dutton was the one who had committed the crime. The State bases its argument on the proposition that the complaints by Ronda made shortly after the alleged attack should be considered part of the res gestae and therefore an exception to the hearsay rule, citing *Choctaw v. State*, (1979) Ind., 387 N.E.2d 1305 and *Block v. State*, (1976) 265 Ind. 569, 356 N.E.2d 683. Dutton on the other hand relies on the general rule that, in a rape case, the prosecution may show the victim made complaint of the attack shortly after its commission but cannot present the details of the complaint which could reveal the name of the person charged with the crime and the particulars of such crime. *Woods v. State*, (1954) 233

Ind. 320, 119 N.E.2d 558 and authorities cited therein.

The cases cited by the State support its contention that, under certain circumstances where the victim remains in an excitable state after the attack, the details of her complaint may be admitted under the theory that they fall within the res gestae or spontaneous exclamation exception to the hearsay rule. Thus in *Choctaw, supra,* an investigating officer was permitted to testify as to details of victim's complaint made on the scene within an hour of the incident. Although our Supreme Court did not detail the investigating officer's testimony laying the foundation for such testimony, the Court concluded:

> "[t]he victim was still in a state of mental excitement from the rape. These circumstances of time and mental condition diminish the probability that the victim deliberated and fabricated the story, and render these utterances trustworthy. Consequently, they fall within the *res gestae* or spontaneous exclamation exception to the hearsay rule and the trial court therefore committed no error in permitting the testimony."

*Id.* at 1308.

Also in *Block, supra,* details of the rape victim's complaint were admitted, the Court stating:

> "After the commission of the crimes in this case, the victim drove directly to her sister's home. Testimony at trial established that the drive from the South Bend apartment to Niles, Michigan takes about fifteen minutes. When she saw her sister, the prosecutrix was crying—'a wierd [sic], scary cry'—and was asked simply 'Debbie, what's the matter?' After telling her sister what happened, the prosecutrix passed out. She awoke later in a hospital. The hearsay statements admitted into evidence were made under circumstances of time and mental condition which exclude the idea of deliberation and fabrication and render the utterances trustworthy. *Ketcham v. State,* (1959)

240 Ind. 107, 162 N.E.2d 247; 8 I.L.E. *Criminal Law* § 224 (1971). Hearsay objections interposed by defense counsel were properly overruled."

Turning to the facts of the case before us, we find that the gasoline station attendant had seen Ronda "from time to time" when she bought cigarettes and soft drinks at the station. He did not know her name or who she was. He stated she was not so much different in appearance from the time he had seen her previously "but she was a whiter shade and [he] could tell she was upset". He also stated "her voice was very shakey and she was shakey herself, her eyes were very wide and . . . her skin very pale". The prosecution made an offer to prove the attendant would testify that Ronda told him she had been attacked by the man who lived in the upstairs apartment and, additionally, to substantially the same facts given by Ronda in her own testimony.

■ We do not believe the trial court abused its discretion in excluding the challenged testimony. In *Choctaw, supra,* the foundation for such testimony as part of the res gestae was apparently established by a police investigator, a trained observant of circumstances surrounding a criminal event and who, through experience, undoubtedly had occasion to view victims of crimes in their varying emotional states. In *Block, supra,* where the complaint was made some fifteen minutes after the incident, the testifying witness was the sister of the victim and, by virtue of that close association, was a reliable witness as to the state of her sister's mental excitement. In the case before us the attendant had only a passing acquaintance with Ronda and was not a trained police investigator. Thus, although the complaint here was made five or ten minutes after the alleged attack, we cannot conclude the trial judge, who had an opportunity to observe the witness, acted in a clearly erroneous manner in finding the attendant's testimony insufficient to establish the mental state of Ronda necessary to

bring her statement within the res gestae exception to the hearsay rule.[2]

### III.

The State contended in its Motion to Correct Errors and now argues on appeal the following:

"3. The Court erred in overruling the State's motion to strike directed to testimony by the defendant that an unidentified police officer made certain statements at the time of the Defendant's arrest that such unidentified police officer could not believe the charges. Such testimony was not responsive to the question, was hearsay, was totally self-serving and had no relevance or materiality to any issue properly in the case."

Our attention is directed by the State to the following direct testimony of Dutton:

"Q. During any of this time before you were arrested, did anybody from the Tippecanie Prosecutor's Office, Tippecanoe County Prosecutor's Office, call you to ask you your version of—of what happened on May 2nd?

A. Nobody contacted me.

MR. DIAMOND: Your Honor, this whole line of questioning is totally irrelevant to any issue that's in the case.

MR. MOORE: It—I think it's important, Your Honor, to show that this man has never been asked to give his side of the story.

THE COURT: Overruled. You may answer it.

Q. Did they—anybody ever come out from the Tippecanoe County Prosecutor?

A. Nobody.

Q. Okay. Did anybody ever come out from the Lafayette Police Department?

A. No.

Q. When is the first time that you knew that you had been accused of attempted rape?

A. I asked the police officer down at the county jail what—why I was arrested, and he called it in—he—he must have called to the city police or city hall. And I remember his conversation saying—he—he was saying 'What—say that again. I'm talking about George Dutton.' And then he came back and then he came—he—

MR. DIAMOND: Your Honor, I would move to strike the last responses as being hearsay.

MR. MOORE: I—we're not putting them in for the truth of what they—happened, just to show how he found out what he was charged with.

THE COURT: It's overruled. Go ahead you may answer.

Q. Please continue.

A. And he says, 'Attempted rape.' I said 'Attempted rape'? I said, 'You gotta be joking. I said, 'Of who'? He said, 'it doesn't say.' I said, 'Well, what is the bond'? And he said, 'Twenty-five thousand.'"

After citing this testimony the Attorney General alleges:

"The above testimony, although not totally clear, indicates that Defendant was allowed to testify to an alleged conversation with an unknown and unnamed police officer who could not believe that Defendant had been charged with attempted rape."

▇ We must confess that, after reading the quoted testimony a number of times, we are unable to infer from it that there was an "unknown and unnamed police officer who could not believe that Defendant had been charged with attempted rape." But the Attorney General devotes several pages of argument and numerous citations in support of its claim.

The quoted testimony made no reference whatsoever to a police officer's opinion of Dutton's innocence. There was no error here.

---

**2.** No offer to prove was made concerning Mr. Holladay's possible testimony concerning Ron-

da's complaint. Therefore, we cannot address the issue.

## IV.

The State argues the following error as specified in its motion to correct errors:

"The Court erred in refusing to grant and in overruling the State's objection to statements made by counsel for defendant during final arguments that the jurors could themselves be the subject of false charges of criminal misconduct and should acquit the defendant for such reason. Such argument is totally improper and is inflammatory and prejudicial so as to divert the jurors from the proper issues in the case."

The particular argument to which the State objects was:

"Now, the prosecutor says we're raising a red herring when we criticize the prosecutor's office, you know, and they suggest that we do that every time. You know, we don't do that every time. Most of us that—that try cases have a genuine feeling for—for the people that we represent. Now, George Dutton comes to me and George Dutton is accused of this serious of a crime. He's facing this—the jeopardy of—of being deprived of his liberty. And you say on what basis, why is this happening to him? You know, why is he being charged with this crime? What has happened? What investigation has occurred that we could not say George Dutton is—is—is possibly guilty of a Class B felony, that we would have it published in the papers throughout this county that this man is a potential rapist? That—that's one of the most serious labels that we could put on somebody. And he—and you don't like it, and we don't like it. And what we're saying is that at no time did they ever attempt to get George Dutton's version of this story. At no time after this lady came down and made the complaint and all this time passed, over two weeks, at no time did they come around and say, 'Well, before we put this label on this man, before we bring all of the police agencies and all the power of prosecutors against this man, let us see what this man says about the charge.' You know, was there an emergency; was it some reason they had to lock him up the next day? Well, obviously not. They didn't do it. *That's what we're angry about. That's why we're mad. That's why we question the way this whole thing has been conducted. We think that is a legitimate reason. That's not a red herring. That's talking about the way the system of justice should be administered. And, ladies and gentlemen, I think that—that you—you have to believe and have to realize that if that type is the way that somebody's going to be charged with a crime, if it can happen to George Dutton it can happen to the people out here in the courtroom, it can happen to me, and it can happen to you.*"

■ The State objects to the emphasized portion of the argument urging it, in effect, asks the jury to consider the fact that they might themselves be accused with a similar crime under the same circumstances Dutton was so accused. These remarks, it claims, were outside the evidence and prejudicial in that they asked, inferentially, that the jury consider matters other than the guilt or innocence of this particular defendant. We agree the comment was somewhat improper. Certainly, neither party should "invite the jury to consider matters not in evidence as a basis for their decision". *Craig v. State,* (1977) 267 Ind. 359, 366, 370 N.E.2d 880, 883; 8A I.L.E. *Criminal Law* § 485 (1971). The court could have properly reminded the jury, after the State's objection, that they were to decide the guilt or innocence of the defendant solely from the evidence and the reasonable inferences drawn therefrom and not on the basis that they themselves might be charged with a crime.

## V.

■ The State's last issue involves the court's refusal to answer a question directed to the judge by the jury during its deliberations. The question in issue was "If—if charges are filed with the prosecuting attorney's office against someone, is the prosecutor obligated to bring the case to trial if the injured party insists or demands it regardless of whether he feels he has a

case?" The State complains the judge's failure to answer this question created an erroneous impression in the mind of the jury that the prosecuting attorney did not have discretion in this case and was required to act on Ronda's complaint although the evidence was marginal.

We note that defense counsel, in his final argument, attacked the alleged incomplete investigation of this case, but the attack was based on evidence that the police had never attempted to interview Mr. Dutton to establish his side of the story and, among other things, that the prosecutor failed to make any attempt to obtain the torn clothing of the alleged victim. He suggested the prosecutor and police sympathized with Ronda and did not critically analyze her story.

We can understand the State's position in this matter, but feel the judge was correct in avoiding comment on the discretion possessed by a prosecutor in initiating criminal cases. By suggesting to the jury that the prosecutor brings an action where he believes there is a strong case, the judge would have created an impression, by implication, that the prosecutor had other evidence, outside the record, which convinced him the prosecution had merit.

In this regard, it is settled that the prosecuting attorney's comments throughout the trial, including his final argument, must be restricted by law to the evidence and must not be based on implied personal knowledge. *Marsh v. State*, (1979) Ind., 396 N.E.2d 883.

Finally, we note the court formally instructed the jury that the charging affidavit was merely an accusation against the defendant, was not evidence of his guilt and that no juror should permit himself to be influenced against the defendant because of the fact that an affidavit had been filed charging him with the crime. Thus we conclude the court correctly handled this situation by avoiding any comment which might have bolstered the State's case and was not an issue before the jury.

In summation, other than the admonition that the trial court could have given under issue IV we find its rulings were correct.

YOUNG and CHIPMAN, JJ., concur.